PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA  92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SILVIA GARCIA,<br><br>          Plaintiff,<br><br>          v.<br><br>BLACKHAWK NETWORK, INC., an Arizona corporation, d/b/a WWW.GIFTCARDS.COM,<br><br>          Defendant. | Case No.:  2:25-cv-07550-JLS-SSC<br><br>**SECOND AMENDED COMPLAINT** |

Plaintiff Silvia Garcia ("Plaintiff") alleges as follows:

## I.     NATURE OF ACTION

1.     This Second Amended Complaint concerns an egregious privacy violation and total breach of consumer trust in violation of California law.  When consumers visit the commercial website of https://www.giftcards.com (the "Website"), which is owned and operated by Defendant Blackhawk Network, Inc. ("Defendant"), Defendant displays to them a pop-up cookie consent banner known as a consent management platform ("CMP") on the homepage.  Defendant's cookie banner discloses that the Website uses cookies, but expressly gives users the option to control how they are tracked and how their personal data is used.  Defendant assures visitors that they can

SECOND AMENDED COMPLAINT

choose to "Required only" cookies by clicking a button with that name as shown in the following screenshot:



2.    Like many internet websites, Defendant designed the Website to include resources and programming scripts from third parties that enable those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data.  Unlike other websites, however, Defendant's Website offers consumers a choice to browse without being tracked, followed, and targeted by third party data brokers and advertisers.  Defendant's promises, however, are false.  Defendant's promises are designed to lull users into a false sense of security. Even after users elect to accept "Required only" cookies, Defendant surreptitiously enables numerous third parties – including registered data brokers, Comscore, Conversant, Dstillery, Liveramp, Oracle, and TripleLift, as well as other entities known as Rakuten, TheTradeDesk, and Xaxis (collectively, the "Third Parties") – to track users' website browsing activities and eavesdrop on users' private communications on the Website via either pixels or third-party cookies stored on user devices from which they transmit information to third party servers.

- 2 -

SECOND AMENDED COMPLAINT

3.      Contrary to users' express rejection of cookies and tracking technologies on the Website, Defendant, nonetheless, caused cookies, including the Third Parties' cookies, to be sent to Plaintiff and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data.  Plaintiff is informed and believes and thereon alleges that these third-party cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

4.      The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain including creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

5.      This type of tracking and data sharing is exactly what the Website visitors who clicked or selected the "Required only" button on the Website's cookie consent banner sought to avoid.  Defendant falsely told Website users that it respected their privacy and that they could avoid tracking and data sharing when they browsed the Website.  Despite receiving notice of consumers' express declination of consent, Defendant defied it and violated state statutes, and tort duties.

## II.    THE PARTIES

6.      Plaintiff is, and was at all relevant times, an individual and resident of the State of California.  Plaintiff is and was at all times mentioned herein a citizen of the State of California.  Plaintiff intends to remain in California and makes her permanent home there.

- 3 -

7. Defendant is a corporation incorporated under the laws of the State of Arizona. According to Defendant's Statement of Information, Corporation, filed with the Office of the Secretary of State for the State of California on August 11, 2025, Defendant's principal office is located in California.

## III. JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 because it has original federal question jurisdiction.

9. Defendant is subject to jurisdiction under California's "long-arm" statute because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States."

10. Defendant is an online retailer that owns and/or operates the Website, which markets, advertises, and sells products and/or services nationwide and in California. Defendant has substantial contacts with and receives substantial benefits and income from and through the state of California. Defendant made, and continues to make, offers to consumers in California.

11. Defendant engaged in intentional acts by operating its Website and making it available to California residents, advertising its products including gift cards via its Website to California residents including Plaintiff, expressly aiming its conduct toward California residents by conducting substantial business with residents of the State of California via its Website, and causing both intangible injuries and economic harm to California residents that Defendant knew would be likely to be suffered in California.

12. Defendant sells products and/or services to California residents via the Website as part of its regular course of business. Plaintiff is informed and believes and thereon alleges that Defendant sells thousands of products and/or services each year to California residents via the Website. Plaintiff is informed and believes and thereon alleges that Defendant exercises at least some level of control over the ultimate distribution of its products sold via the Website including products shipped into California.

- 4 -

SECOND AMENDED COMPLAINT

13.    Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the acts and events giving rise to the claims occurred in this District.

## IV.    FACTUAL ALLEGATIONS

**A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Trackers.**

14.    Every website including the Website is hosted by a server that sends and receives communications in the form of HTTP requests such as "GET" or "POST" requests to and from Internet users' browsers.  For example, when a user clicks on a hyperlink on a Website, the user's browser sends a "GET" request to the Website's server.  The GET request tells the Website's server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested).  When the Website server receives an HTTP request, it processes that request and sends back an HTTP response.  The HTTP request includes the client's IP address so that the Website server knows where to send the HTTP response.

15.    An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

16.    Defendant voluntarily integrated "third-party resources" from the Third Parties into the Website's programming. "Third-party resources" refer to tools, content or services provided by third-parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's

- 5 -

use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

17.    The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies.  Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device.  As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users.  Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

18.    First-party cookies are those that are placed on the user's browser directly by the web server with which the user is knowingly communicating (in this case, the Website's servers).  First-party cookies are used to track users when they repeatedly visit the same website.

19.    A third-party cookie is set by a third-party domain/webserver (e.g., www.youtube.com; irxcm.com; clarity.ms, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

20.    As described further below, the Website has embedded the software code of multiple data brokers registered with the California Privacy Protection Agency. According to the esteemed Brennan Center for Justice, data brokers are "the main purveyors of surveillance capitalism" that "collect, assemble, and analyze personal information to create detailed profiles of individuals, which they then sell to "financial institutions and insurance firms….Advertising companies… predatory loan companies,

- 6 -

stalkers, and scammers…foreign actors…and law enforcement and other government agencies including the FBI and the IRS."). *See* https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole (last visited Sept. 4, 2025). Plaintiff is informed and believes and thereon alleges that the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions**: Data on which links, buttons, or ads on the Website that a user clicks;

- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website's content;

- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the Website that referred the user to the Website;

SECOND AMENDED COMPLAINT

• **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Websites during that session;

• **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and

• **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

21. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to boost website performance and revenue through the collection, utilization, and dissemination of user data.

22. Defendant owns and operates the Website, which allows visitors to receive information about its products and/or services and to purchase gift cards. As they interact with the Website (e.g., by entering data into forms, clicking on links, and making selections), Website users communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

- 8 -

SECOND AMENDED COMPLAINT

23.   Defendant chose to install or integrate the Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the software code of its Website, it has complete control over whether first-party and third-party cookies are placed on its users' devices and/or transmitted to third parties.

24.   Defendant explained the third-party cookies it used on the Website as follows on the Blackhawk Network Privacy Notice updated as of August 9, 2024 (the "Privacy Policy")[1]:

"We and our third-party service providers collect information automatically through Technologies.[2]   We, or our service providers, may combine this information with other information, including personal information we collect about you, *to record your preferences, gather information about the use of our Sites and Services*, identify when our emails are viewed, *personalize content and ads and track information about the performance of our advertisements*."

Privacy Policy updated August 9, 2024 (emphasis added); https://blackhawknetwork.com/privacy-policy-2024 (last visited Sept. 30, 2025).

25.   Defendant's Privacy Policy updated as of August 9, 2024 further explained the Website's use of cookies as follows:

"These are small files with a unique identifier that are transferred to your browser through our sites. Cookies allow us to collect information such as browser type, time spent on our sites, *pages visited*, language preferences, and your relationship with us. We can use this information to analyze trends, administer the website, track users' movements around the site, measure the effectiveness of our

---

[1] Although Defendant has apparently updated its Blackhawk Network Privacy Notice as of May 12, 2025, such date is subsequent to Plaintiff's visit to the Website.
[2] "Technologies" is defined to mean "cookies, web beacons, java script, log files, pixels, and other technologies."  Privacy Policy updated August 9, 2024.

- 9 -

communications, *tailor our advertising to you*, and gather demographic information about our user base as a whole. *Cookies may provide us with information about devices and networks you utilize to access our sites and Services*, and other information regarding your interactions with our sites and Services."

Privacy Policy updated August 9, 2024 (emphasis added); https://blackhawknetwork.com/privacy-policy-2024 (last visited Sept. 30, 2025).

26. Defendant's Privacy Policy updated as of August 9, 2024 explained Defendant's use of targeted advertising in relevant part as follows:

"We partner with third-party ad networks and third-party ad companies to manage our advertising on other sites. Our third-party partners use Technologies to gather information about your activities across our sites and other sites in order to provide you *personalized advertising based upon your browsing activities and interests*.

…

We also partner with certain third parties so that we can *better target ads and content to our users*, and others with similar interests, on these third parties' platforms or networks ("Custom Audiences")."

Privacy Policy updated August 9, 2024 (emphasis added); https://blackhawknetwork.com/privacy-policy-2024 (last visited Sept. 30, 2025).

27. The Website's Privacy Policy updated August 9, 2024 contains a clickable hyperlink named "Cookie Notice," which, if clicked, take the user to the landing page at: https://blackhawknetwork.com/cookie-policy. At the time of Plaintiff's visit to the Website, if a user clicked on such hyperlink, the landing page displayed the Blackhawk Network Cookie Notice last purportedly updated on September 1, 2020 (the "Cookie Notice"). The Cookie Notice stated in part:

"Using cookies helps us provide you with a better user experience, helps us to understand and improve how our services perform, *lets us personalize your*

- 10 -

*experience on our sites, and helps our advertising partners deliver more relevant advertisements to you on our sites and on other sites that you visit.*" https://web.archive.org/web/20250329215120/https://blackhawknetwork.com/cookie-policy (last visited Sept. 30, 2025) (emphasis added).

28.    The Cookie Notice stated that Defendant's websites use cookies including "Targeting" cookies, which it described as follows:

"'Targeting' cookies are *used to track your visit to the website, as well on other websites, apps and online services*. They *enable our advertising network partners to recognize when you are visiting other pages on other websites* and *allows them to deliver targeted ads or other marketing messages*.

Targeting cookies may be used to:

•    *Display targeted ads within our website or other websites*.

•    To improve how we deliver personalized ads and content, and to measure the success of ad campaigns on the website.

Most of the targeting cookies used on our site are managed for us by third-parties advertising network partners and service providers."

https://web.archive.org/web/20250329215120/https://blackhawknetwork.com/cookie-policy (last visited Sept. 30, 2025) (emphasis added).

**B.    Summary of Tracking Technologies Operating Via the Website.**

29.    The spyware services detected by Plaintiff's computer expert as operating through the Website are specifically designed to track users across multiple websites through third-party cookies and by using external IDs to synchronize data stored across other advertising platforms.  This renders such activities highly offensive to Plaintiff (and other visitors of the Website).

30.    The spyware services detected by Plaintiff's computer expert as operating through the Website have the capability of inferring sensitive information about Website users because the spyware services aggregate browsing activity across websites

and can infer sensitive information such as health interests, travel behavior, political views, and personal characteristics based on patterns of activity.

31. Notably, the CPPA's data broker registry has recently updated the information that it provides to the general public about registered data brokers to show the precise categories of data that they collect from Californians. The following is an overview of the CPPA data tracked by service:

- TripleLift collects gender identity, personal information/device IDs;
- LiveRamp collects IDs/social security number, personal information/device IDs;
- Conversant/Epsilon collects reproductive health, personal information/device IDs;
- Magnite collects precise geolocation, personal information/device IDs;
- Nielsen collects personal information/device IDs;
- Comscore collects minors' data, personal information/device IDs;
- Dstillery collects personal information/device IDs;
- Transunion's privacy policy identifies the personal data it collects and the sources at:  https://www.transunion/com/privacy/trueaudience.

32. On June 9, 2025, network traffic generated during interaction with the Website was captured by Plaintiff's computer expert using browser developer tools and preserved in HAR (HTTP Archive) format. These captures record all network requests made by the browser while loading and interacting with the Website.

33. The analysis of the Website documented on June 9, 2025 identifies third-party services receiving user interaction data, examines persistent identifiers stored in the browser, and evaluates how those identifiers enable cross-site tracking, behavioral profiling, and data sharing with external entities.

34. The Website deploys multiple third-party tracking technologies that transmit user activity to external companies *immediately upon page load* before any consent has been obtained. These technologies include data brokers, advertising

- 12 -

exchanges, identity resolution platforms, and behavioral analytics systems. These systems assign persistent identifiers to the user's browser and synchronize those identifiers across multiple platforms.

35. The tracking technologies deployed on the Website are designed to track users beyond the boundaries of a single website. Services such as LiveRamp, The Trade Desk, Adobe Audience Manager, Xandr, Magnite, Nielsen, Conversant, and Dstillery operate as part of large-scale advertising and data brokerage ecosystems that rely on cross-site tracking of Website visitors.

36. These systems use cookie synchronization and identifier matching to link user identities across platforms. For example:

- Requests to idsync.rlcdn.com (LiveRamp) synchronize user identifiers across partners

- Requests to adsrvr.org (The Trade Desk) distribute identifiers into advertising exchanges

- Requests to adnxs.com (Xandr) and doubleclick.net (Google) integrate users into real-time bidding ecosystems.

37. Through these mechanisms, the same browser is recognized across different websites that deploy the same tracking infrastructure. Because these tracking systems aggregate activity across multiple websites, they are capable of inferring highly sensitive information about users. By observing patterns of browsing behavior, these systems can determine information such as:

- Health interests based on websites viewed and geolocation of places visited.

- Travel behavior based on visits to airline, hotel, or booking platforms, and even tracking consumer online and offline purchases.

- Political interests or affiliations based on consumption of political content

- Personal characteristics and preferences based on lifestyle, shopping, and content engagement.

SECOND AMENDED COMPLAINT

38.    Because identifiers are synchronized across platforms, activity observed on the Website can be linked with existing datasets containing prior browsing history. This allows third parties to derive sensitive attributes even when the user does not provide that information directly on the site.

**C.    Plaintiff's Investigation Has Detected Data Collection and Third Party Cookies Stored Prior to Consent.**

39.    Plaintiff's investigation of the Website has detected data collection and third party cookies downloaded from the Website that are stored on user browsers or devices prior to consent.

40.    Plaintiff's investigation of the Website has determined that visitor data is harvested and shared with third-party services immediately upon webpage loading, preceding any opportunity for visitors to consent to or decline the Website's non-essential cookies in the CMP and Privacy Policy. In other words, third-party requests occur immediately when the webpage loads, before the user is given an effective opportunity to grant or deny consent through the site's cookie banner's privacy controls. The browser allows multiple third-party advertising platforms and data brokers to install client-side scripts on the browser that execute immediately, transmitting technical and behavioral information from the user's browser to external servers.

41.    The browser's developer tools allows for the inspection of third-party cookies stored on a user's device by a website, which reveals the cookie's name, the domain that set it, its category or purpose, and the platform with which it is associated.

42.    Third-party cookies can only be set by the third-party server itself, and not by the website directly.  Thus, if a third-party cookie is present, it necessarily means that a tracking script from that third party was loaded and successfully executed on the website at issue.

43.    Once the tracking script runs, it sends user data to the third party's server. In response, the server sets a cookie in the visitor's browser.  This cookie allows the

- 14 -

SECOND AMENDED COMPLAINT

third party to recognize and track the user during future visits even across different websites.

44.    Plaintiff's investigation of the Website on June 9, 2025, detected multiple third party code deployed on a user's browser without consent provided by the user immediately upon webpage loading as depicted in the screenshot below:



### 1.    **LiveRamp**

45.    LiveRamp, Inc. ("LiveRamp") is a data broker registered with the California Privacy Protection Agency.  *See* https://cppa.ca.gov/data_broker_registry/ (last visited Sept. 30, 2025).



SECOND AMENDED COMPLAINT

46.    LiveRamp is a data onboarding platform that collects and integrates a company's online and offline customer data, mapping it to individual customer profiles. LiveRamp's identity resolution system is specifically designed to link user activity across different websites and devices. Through cookie synchronization requests such as idsync.rlcdn.com, LiveRamp connects identifiers from multiple platforms, allowing it to recognize the same user across unrelated websites. This enables LiveRamp to aggregate browsing activity from multiple sources and incorporate it into unified consumer profiles used for targeted advertising and data brokerage.

47.    A request is sent to the URL "idsync.rlcdn.com" to synchronize user data between LiveRamp and third-party partner platforms. Tracking cookies stored in the browser are included in this request to enhance visitor identification and enable deeper data enrichment.



## 2. **Magnite**

48. Magnite is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Sept. 30, 2025).

49. Magnite tracks a user's precise geolocation as depicted on the website of the California Privacy Protection Agency.



50. Magnite is a programmatic advertising platform that operates as a supply-side platform (SSP). It facilitates the automated buying and selling of digital advertising inventory across websites, mobile apps, connected TV (CTV), and streaming services.

51. Through cookie syncing and ID matching with other ad-tech participants, Magnite facilitates the broader advertising ecosystem's ability to build user profiles and deliver personalized advertisements across multiple websites and platforms.

52. Requests to Magnite transmit device-level and browser-level information, including IP address, page URL, referrer, device type, operating system, browser characteristics, and advertising identifiers or cookie-based IDs. These identifiers allow Magnite and its demand-side advertising partners to recognize returning browsers, associate activity across sessions, and participate in cross-site behavioral advertising.

///

///

- 17 -

53.    A screenshot of Magnite's own documentation stating its collection of device IP addresses at:    https://www.magnite.com/responsible-advertising-and-data-governance/ is as follows:

54.    Requests are sent to Magnite servers (rubiconproject.com) and contains external IDs used to synchronize records of user behavioral data with the advertising platform The Trade Desk. Tracking cookies are stored on the browser, allowing users to be identified and online activity tracked for the next 365 days.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

- 18 -



55.    A screenshot of the Data Payload containing external user ID and redirect URL to The Trade Desk is as follows:



///

///

SECOND AMENDED COMPLAINT

56.    A screenshot of third-party tracking cookies stored on the browser is as follows:

| Name | Value | Domain | Path |
|---|---|---|---|
| audit | 1\|MOgtXY+VScXnCrt1VU4L0E6QptAllG7NSXzS3pl0kzsaxlGG... | .rubiconproject.com | / |
| audit_p | 1\|MOgtXY+VScXnCrt1VU4L0E6QptAllG7NSXzS3pl0kzsaxlGG... | .rubiconproject.com | / |
| khaos | MBPD3DXX-P-BPA0 | .rubiconproject.com | / |
| khaos_p | MBPD3DXX-P-BPA0 | .rubiconproject.com | / |

### 3.    **Nielsen Marketing**

57.    The Nielsen Company and eXelate Inc. doing business as Nielsen Marketing Cloud is a data broker registered with the California Privacy Protection Agency.  *See* https://cppa.ca.gov/data_broker_registry/ (last visited Sept. 30, 2025).

| DATA BROKER NAME | WEBSITE | DATA COLLECTION INCLUDES |
|---|---|---|
| eXelate, Inc. DBA: Nielsen Marketing Cloud | nielsen.com | Personal Info + Device IDs |
| The Nielsen Company, LLC DBA: Nielsen Marketing Cloud | nielsen.com | Personal Info + Device IDs |

58.    Nielsen's Digital Content Ratings and identity systems are designed to measure user behavior across multiple websites and platforms. The service uses persistent identifiers and cross-device matching techniques to track users beyond a single site visit. This allows Nielsen to construct audience profiles that reflect user behavior across the internet rather than activity limited to a single website.

59.    Requests are sent to Nielsen servers (imrworldwide.com) containing external IDs used to synchronize records of user behavioral data with the advertising

platform The Trade Desk. Third-party cookies are then stored on the browser for the cross-site identification and tracking of users, and to deliver targeted advertisements.



60.     A screenshot of the data payload is as follows:



61.     A screenshot of the third party cookie is as follows:

| Name | Value | Domain | Path |
|---|---|---|---|
| IMRID | 97081a40-4556-11f0-aae7-d10afead52b9 | imrworldwide.com | / |

- 21 -

SECOND AMENDED COMPLAINT

**4.** **TransUnion TruAudience (formerly Tru Optik Data Corp.)**

62. Tru Optik Data Corp. ("Tru Optik"), *i.e.*, TransUnion, is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Sept. 30, 2025).

63. Tru Optik was acquired by TransUnion and included in the latter's "Tru" marketing ecosystem, branding it as TruAudience. According to the TransUnion Privacy Policy, personal data is tracked.

64. Requests are sent to TransUnion servers (truoptik.com) to synchronize user cookie data and it stores tracking cookies on the browser.



**5.** **Adobe Audience Manager**

65. The Audience Manager feature offered by Adobe gathers user data from websites to develop behavioral profiles and categorize users into targeted audiences. This information is utilized for purposes such as targeted advertising and customizing website content to enhance user experience. Additionally, visitor IP addresses are collected at the start of each new session to identify geolocation, enabling segmentation of users for more relevant advertising efforts.

- 22 -

66.     The Website uses third-party cookies for Demdex.net to assign tracking IDs to users and record their online activity via data sent in network requests. These are the tracking cookies stored on the browser for enhanced visitor identification and tracking with future requests.



67.     The "demdex" tracking cookie is used to identify a specific user to link the user's activities on this Website to a visitor profile already stored.

68.     The Data Provider Match, or "dpm" cookie, is used when a website is trying to identify visitors and add their activity to an existing matched user.



### 6.     Google Ads

69.     Google assigns persistent identifiers and integrates user activity into its advertising systems, enabling cross-site tracking, audience creation, and behavioral profiling.

///

///

- 23 -

70.   The requests sent by the Website to TheTradeDesk (adsrvr.org) then send requests to Google Advertising servers (doubleclick.net) to synchronize user cookie data with the platform.





### 7.   TheTradeDesk

71.   The Trade Desk, Inc. is an American multinational technology company that specializes in real-time programmatic marketing automation technologies, products, and services, designed to personalize digital content delivery to users. These platforms operate as part of real-time advertising exchanges that rely on cross-site tracking to

SECOND AMENDED COMPLAINT

build audience profiles. The identifiers collected during the visit are used to recognize users across other websites that participate in the same advertising network.

72. The Website giftcards.com sends requests to TheTradeDesk servers (adsrvr.org) to track visitor activity on the Website, sync user cookie data with third party platforms, and stores tracking cookies on the browser.



### 8. Xandr

73. A Microsoft-owned data aggregation company that operates an online platform for buying and selling consumer data for digital advertising campaigns. This platform operates as part of real-time advertising exchanges that rely on cross-site tracking to build audience profiles. The identifiers collected during the visit are used to recognize users across other websites that participate in the same advertising network.

74. When a visitor accesses a website using Xandr, a request is sent to the Xandr tracking URL (adnxs.com), which allows Nexxen to gather data about the user's device and location. The X-Proxy-Origin in the response header reveals the device's IP address, which identifies the geographic region from where the request originated.  In other words, Xandr geolocates users.

75. The user's IP address in the X-Proxy-Origin response header and tracking cookies are stored on the user's browser as depicted in the screenshot below:



76.     The X-Proxy-Origin is an HTTP Header used to expose privacy-sensitive information by design. When a user connects directly to a server the client's IP address is sent to the server, but if a user connection passes through any forward or reverse proxies, the server only sees the final proxy's IP address. By passing the original client's IP address in the X-Proxy-Origin header the backend servers are able to identity and preserve the user's IP address.

**D.    Defendant Falsely Informed Users that They Could Reject the Website's Use of Cookies.**

77.     When consumers in California visited the Website, the Website immediately displayed to them a pop-up cookie consent banner.  The pop-up cookie consent banner stated, "This site uses third party cookies and related technologies, which may include ads personalization.  Choose whether to allow all cookies (and related technologies) or the minimum set of required cookies.  For more options and information visit cookie settings."

78.     The cookie consent banner purported to provide users the opportunity to allow only "Required only" cookies as shown in the following screenshot from the Website:

/ / /

SECOND AMENDED COMPLAINT



79. Website users who clicked or selected the "Required only" cookies button, indicating their choice and/or agreement to decline or reject all non-essential cookies and tracking technologies in use on the Website, could then continue to browse the Website, and the pop-up cookie consent banner disappeared.

80. Defendant's pop-up cookie consent banner led Plaintiff, and all those similarly situated users of the Website, to believe that they declined or rejected all cookies and tracking technologies, especially those that share personal information with third parties, such as performance, targeting, and social media cookies. The banner further reasonably led Plaintiff and other Website users to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Required only" cookies button. Defendant's representations, however, were false.

81. In truth, Defendant did not abide by its users' wishes. Even though Defendant received notice that certain users, through their selection of the "Required

SECOND AMENDED COMPLAINT

only" cookies button did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website, Defendant nonetheless caused the Third Party tracking cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data—***even for those users who elected to reject all non-essential cookies***.

82.   In particular, when users clicked or selected the "Required only" cookies button, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiff tried to protect their privacy by rejecting cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

83.   Some aspects of the operations of the Third Party cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions.  The following screenshot, obtained using one such tool, shows an example of Third-Party cookies being transmitted from a Website user's device and browser to the servers of third parties even after the user clicked the "Required only" cookies button on the Website's pop-up cookie consent banner.  Such screenshot depicts the third-party cookies stored on the visitor's browser after the page is refreshed, which includes advertising cookies for registered data brokers, Comscore, Conversant, Dstillery, LiveRamp, and TripleLift, as well as other third parties such as Addthis.com / Oracle, Rakuten Advertising, and Xaxis.

/ / /

/ / /

/ / /

- 28 -



84.     In summary, despite the user explicitly rejecting non-essential cookies, Plaintiff's investigation via a computer expert has determined that the Website's third-party tracking infrastructure remained present and capable of recognizing the user through identifiers previously stored in the user's browser. These identifiers persist independently of the user's consent choice and can continue to be used by third-party platforms to track the user across other websites. As a result, even after opting out, the user remains identifiable within external advertising and data broker ecosystems, allowing continued cross-site tracking and behavioral profiling.

85.     After a user opts-out of non-essential cookies, some of the pre-consent spyware may no longer actively track visitor activity on the Website.  However, the data already collected is retained and the third party cookies stored before consent persist in the browser storage, enabling third-parties to engage in cross-site tracking and targeting of visitors.

SECOND AMENDED COMPLAINT

### 1.    ComScore

86.    ComScore, Inc. ("ComScore") is a data broker registered with the California Privacy Protection Agency.  *See* https://cppa.ca.gov/data_broker_registry/ (last visited Sept. 30, 2025).

87.    ComScore is a programmatic targeting suite that allows advertisers to hyper-target audiences and tracks users across desktops, mobiles, and tablets, creating user personas containing information such as demographics, interests, and content consumption habits.

88.    Requests are sent to ComScore servers (scorecardresearch.com) to track visitor activity on the site and stores tracking cookies on the browser.



### 2.    Conversant/Epsilon

89.    Conversant LLC ("Conversant") is a data broker registered with the California Privacy Protection Agency.  *See* https://cppa.ca.gov/data_broker_registry/ (last visited Sept. 30, 2025).

| DATA BROKER NAME | WEBSITE | DATA COLLECTION INCLUDES | DATA SOLD/SHARED TO |
|---|---|---|---|
| Epsilon Data Management, LLC | epsilon.com | Reproductive Health<br>Personal Info + Device IDs | Foreign Actor |

90. The Conversant platform, which was formerly Dotomi/ValueClick, was acquired by Alliance Data and was integrated into their product known as Epsilon. https://www.adexchanger.com/platforms/alliance-data-buys-epislon-a-2-3b-present-conversant/

91. Conversant specializes in personalized digital marketing. The company collects detailed user data, including online behavior and engagement across devices, to deliver targeted advertisements. Conversant's tracking technologies enable the aggregation of personal information without explicit user awareness, contributing to comprehensive consumer profiling. Given that Conversant is formally registered as a data broker in California, this indicates that it has an active role in the collection and sale of personal data of California consumers.

92. Requests are sent to Conversant servers (dotomi.com) to track visitor activity, synchronize data with third-party platforms, and it stores tracking cookies on the user's device.

///

///

///

///

///

///

///

///

- 31 -

SECOND AMENDED COMPLAINT



### 3. **Dstillery**

93. Dstillery is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Sept. 30, 2025).



| DATA BROKER NAME | WEBSITE | DATA COLLECTION INCLUDES |
|---|---|---|
| Dstillery, Inc. | dstillery.com | Personal Info + Device IDs |

94. Dstillery is an artificial intelligence advertisement targeting company that tracks and analyzes user behavior to enable marketers to deliver targeted advertisements to users.

95. The Website sends a request to Dstillery servers (media6degrees.com) to track visitor activity on the Website and store tracking cookies on the browser, allowing Dstillery to track visitor activity online.

/ / /

/ / /

/ / /

- 32 -



#### 4. **LiveRamp**

96. As mentioned above, LiveRamp is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Sept. 30, 2025).

97. LiveRamp is a data onboarding platform that collects and integrates a company's online and offline customer data, mapping it to individual customer profiles. This enriched audience data is then uploaded to advertising platforms. The LiveRamp privacy policy states user information is collected and used for visitor identification and interest-based advertising.

98. LiveRamp's identity resolution system is specifically designed to link user activity across different websites and devices. Through cookie synchronization requests such as idsync.rlcdn.com, LiveRamp connects identifiers from multiple platforms, allowing it to recognize the same user across unrelated websites. This enables LiveRamp to aggregate browsing activity from multiple sources and incorporate it into unified consumer profiles used for targeted advertising and data brokerage.

SECOND AMENDED COMPLAINT

99.   A request is sent to the URL "idsync.rlcdn.com" to synchronize user data between LiveRamp and third-party partner platforms. Tracking cookies stored in the browser are included in this request to enhance visitor identification and enable deeper data enrichment.



### 5.   TripleLift

100.   TripleLift, Inc. ("TripleLift") is a data broker registered with the California Privacy Protection Agency.  *See* https://cppa.ca.gov/data_broker_registry/ (last visited Sept. 30, 2025).

101.   TripleLift tracks a user's precise geolocation as depicted on the website of the California Privacy Protection Agency.

| Business Name (Doing Business As) | Email | Website | Minors | Precise Geolocation | Reproductive Healthcare Data |
|---|---|---|---|---|---|
| TripleLift, Inc. (TripleLift) | Privacy@triplelift.com | https://www.triplelift.com/ | No | Yes | No |

///

///

///

- 34 -

| DATA BROKER NAME | WEBSITE | DATA COLLECTION INCLUDES |
|---|---|---|
| TripleLift, Inc. DBA: TripleLift, Inc. | triplelift.com | Gender Identity   Precise Geolocation   Personal Info + Device IDs |

102. TripleLift is a programmatic advertising platform that tracks users to run targeted advertisements and marketing campaigns.

103. The request is made on behalf of Rakuten (linksynergy.com) to TripleLift servers (3lift.com) to track visitor activity, synchronize user cookie data, and it stores tracking cookies on the browser.



### 6. Addthis.com / Oracle

104. The addthis.com website is owned and operated by Oracle America, Inc., which was a data broker registered with the California Privacy Protection Agency in 2024. *See* https://cppa.ca.gov/data_broker_registry/ *See also* https://oag.ca.gov/data-broker/registration/185679

105. AddThis, owned by Oracle, is a data collection and advertising service that tracks user behavior across websites through embedded sharing tools and tracking scripts. It collects device identifiers, IP addresses, and browsing activity to identify visitors and build behavioral profiles within Oracle's data ecosystem. These identifiers

SECOND AMENDED COMPLAINT

are shared across Oracle's advertising and data platforms and with third-party partners, enabling cross-site tracking, data enrichment, and targeted advertising.

106. The Rakuten scripts loaded by the Website send a request to Oracle servers (addthis.com) to synchronize user cookie data.



### 7. Rakuten Advertising

107. Rakuten Advertising is an advertising platform that brands itself as "the leading data, AI, and network to connect advertisers, publishers, and audiences like never before."

108. The Website sends requests to Rakuten servers (linksynergy.com) to track visitor activity and stores tracking cookies on the browser. The requests sent by the Website allows Rakuten send requests to additional third-party services, which will be seen in later evidence.



### 8. TheTradeDesk

109. The Website sends requests to TheTradeDesk servers (adsrvr.org) to track visitor activity, synchronize user cookie data, and store tracking cookies on the visitor's browser.



### 9. Xaxis

110. Xaxis is a programmatic advertising platform that tracks user behavior across websites to identify visitors and build audience profiles. Its tracking technologies collect device identifiers, IP addresses, and browsing activity, which are used to segment users for targeted advertising. These identifiers are shared with data providers, ad exchanges, and partner platforms, enabling cross-site tracking, data enrichment, and programmatic ad targeting.

111. Tracking scripts used by the Website for TheTradeDesk (adsrvr.org) send requests to Xaxis servers (mookie1.com) to synchronize user cookie data and stores a tracking cookie on the browser.

///

///

///

///

- 37 -



112. Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, are surreptitiously obtained by the Third Parties via these cookies (or via pixels).

113. As users interact with the Website, even after clicking or selecting the "Required only" cookies button, thereby declining or rejecting the use of cookies and similar technologies that share personal information with third parties, such as performance, targeting, and social media cookies, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, enable the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies enable Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target

- 38 -

advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

114. The Third Party code that the Website causes to be loaded and executed by the user's browser becomes a wiretap when it is executed because it enables the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

**E.     The Private Communications Collected Are Valuable.**

115. The Private Communications that the Third Parties (and other third parties) track and collect by way of the cookies on the Website is valuable to Defendant as well as the Third Parties (and other third parties). Defendant can use the data to create and analyze the performance of marketing campaigns, website design, product placement, and target specific users or groups of users for advertisements. For instance, if Defendant wanted to market certain of its products to consumers, Defendant could use the data collected by the Third Parties to monitor users who visit webpages related to specific products, then advertise similar products to those particular users when they visit other webpages. The third-party cookies also enable Defendant to target online advertisements to users when they visit *other* websites, even those completely unrelated to Defendant and its products and services.

116. Data about users' browsing history enables Defendant to spot patterns in users' behavior on the Website and their interests in, among other things, Defendant's products. On a broader scale, it enables Defendant to gain an understanding of trends happening across its brands and across the consumer electronics market. All of this

- 39 -

SECOND AMENDED COMPLAINT

helps Defendant further monetize its Website and maximize revenue by collecting and analyzing user data.

117. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[3] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id.* "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id.*

118. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

119. Through its false representations and aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to track users' Private Communications on the Website using third-party cookies, Defendant is unjustly enriching itself at the cost of consumer privacy and choice, when the consumer could otherwise have the ability to choose if and how they would monetize their data.

**F.     Plaintiff's Experience**

120. On April 3, 2025, Plaintiff visited the Website to browse information about the Website's products advertised on the Website. Plaintiff was unaware of the secret spyware being used to surveil visitors and to monetize their personal information. Plaintiff is both (1) genuinely interested in the goods, services, and information available on Defendant's Website, and (2) a consumer privacy advocate who works as a "tester" to ensure that companies abide by the privacy obligations imposed by California law. The Ninth Circuit recently made exceptionally clear that it is "necessary

---

[3] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

- 40 -

SECOND AMENDED COMPLAINT

and desirable for committed individuals to bring serial litigation" to enforce and advance consumer protection statutes, and that Courts must not make any impermissible credibility or standing inferences against them. *Langer v. Kiser*, 57 F.4th 1085, 1095 (9th Cir. 2023).

121. During Plaintiff's April 3, 2025 visit, third party cookies began to collect information about Plaintiff's device and Plaintiff's interactions with the Website the moment that Plaintiff landed on the Website.

122. When Plaintiff visited the Website on April 3, 2025, the Website immediately presented her with Defendant's pop-up cookie consent banner, which provided the option to select the "Required only" cookies button. Plaintiff viewed Defendant's representation on the pop-up cookie consent banner stating, "This site uses third party cookies and related technologies, which may include ads personalization. Choose whether to allow all cookies (and related technologies) or the minimum set of required cookies. For more options and information visit cookie settings." Plaintiff also viewed Defendant's additional representation that users could select "Required only" cookies.

123. Consistent with her typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff selected and clicked the "Required only" cookies button. Plaintiff believed that selecting the "Required only" cookies button on the pop-up cookie consent banner found on the Website would allow her to opt out of, decline, and/or reject all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of user data to third-party advertising networks, analytics services, and/or social media companies for the purposes of providing personalized content, advertising, and analytics services).

124. In selecting the "Required only" cookies button Plaintiff gave Defendant notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. In reliance on these representations and promises, only when did Plaintiff continue browsing the Website.

- 41 -

125. Even before the pop-up cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for performance targeting, and social media functions, to be placed on Plaintiff's device and/or transmitted to the Third Parties along with user data, without Plaintiff's knowledge. Accordingly, the pop-up cookie consent banner's representation to Plaintiff that she could reject the use and/or placement of all non-essential cookies and tracking technologies while she browsed the Website was false. Contrary to what Defendant made Plaintiff believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

126. Then, as Plaintiff continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing performance, targeting, and social media services, from the Third Parties on her device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff's Private Communications as Plaintiff browsed the Website.

127. Defendant's representations that consumers could allow "Required only" cookies while Plaintiff and users browsed the Website were untrue. Had Plaintiff known this fact, she would not have used the Websites. Moreover, Plaintiff reviewed the pop-up cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all non-essential cookies, Plaintiff would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

128. Plaintiff is informed and believes that either all or the vast majority of the foregoing third-party tracking cookies of the Third Parties were actually installed on

- 42 -

Plaintiff's browser or computer device. Plaintiff's belief is based upon the fact that Plaintiff's visit to the Website occurred on April 3, 2025. Plaintiff's computer expert investigated the Website as early as June 9, 2025 and preserved evidence of the network traffic generated during interaction with the Website captured using browser developer tools and preserved in HAR (HTTP Archive) format. These captures record all network requests made by the browser while loading and interacting with the Website. This record in the HAR format was created and preserved a little more than two months after Plaintiff's visit. In other words, Plaintiff's computer expert's evidence preservation documentation is contemporaneous with Plaintiff's visit.

129. Plaintiff is informed and believes that Plaintiff has been tracked regarding her website interactions (including the webpages that she viewed) across other websites for the purpose of providing Plaintiff with personalized advertising across multiple websites, which is also known as "cross-context behavioral advertising," "which is the targeting of advertising to a consumer based on the consumer's personal information obtained from the consumer's online activity across numerous websites." *Wiley v. Universal Music Group, Inc.*, 2025 WL 3654085, at *4 (N.D. Cal. Dec. 17, 2025) (citing https://oag.ca.gov/privacy/ccpa). Plaintiff's belief is based on the indisputable fact that the Website deploys third party tracking cookies on the browsers and devices of its visitors, which included Plaintiff, which are designed to track visitors across multiple websites regarding their interactions with such multiple websites. As mentioned above, Defendant's Cookie Notice stated in part:

> "Using cookies helps us provide you with a better user experience, helps us to understand and improve how our services perform, ***lets us personalize your experience on our sites, and helps our advertising partners deliver more relevant advertisements to you on our sites and on other sites that you visit***."

https://web.archive.org/web/20250329215120/https://blackhawknetwork.com/cookie-policy (last visited Sept. 30, 2025) (emphasis added). Similarly, Defendant's Cookie Notice also states in relevant part:

SECOND AMENDED COMPLAINT

"Defendant's websites use cookies including "Targeting" cookies, which it described as follows:

"'Targeting' cookies are *used to track your visit to the website, as well on other websites, apps and online services*. They *enable our advertising network partners to recognize when you are visiting other pages on other websites* and *allows them to deliver targeted ads or other marketing messages*.

Targeting cookies may be used to:

• *Display targeted ads within our website or other websites*.

• To improve how we deliver personalized ads and content, and to measure the success of ad campaigns on the website.

Most of the targeting cookies used on our site are managed for us by third-parties advertising network partners and service providers."

https://web.archive.org/web/20250329215120/https://blackhawknetwork.com/cookie-policy (last visited Sept. 30, 2025) (emphasis added). Thus, by referencing the fact that: (i) cookies "helps our advertising partners deliver more relevant advertisements to you on our sites *and on other sites that you visit*," (emphasis added); (ii) "Defendant's websites use … 'Targeting" cookies,'" which "are *used to track your visit to the website, as well on other websites, apps and online services*," and which "*enable our advertising network partners to recognize when you are visiting other pages on other websites* and *allows them to deliver targeted ads or other marketing messages*," (emphasis added), and (iii) "'Targeting' cookies" "*Display targeted ads within our website or other websites*," (emphasis added), Defendant's Cookie Notice confirms that third party cookies encountered via the Website also track Website visitors across other websites.

130. Plaintiff continues to desire to browse content featured on the Website. Plaintiff would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Website was programmed to honor users' requests to reject cookies and tracking technologies, Plaintiff would likely browse the

Website again in the future, but will not do so until then. Plaintiff regularly visits websites that feature content similar to that of the Website. Because Plaintiff does not know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all non-essential cookies and tracking technologies, Plaintiff will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff is not a software developer and has not received training with respect to HTTP network calls.

131. Thus, legal damages are inadequate to remedy the imminent threat of future harm that Plaintiff faces. Only an injunction can remedy this threat of future harm.

**G.      Defendant Is a Principal Under Section 31 of the Penal Code.**

132. Section 31 of the Penal Code provides in relevant part: "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . are principals in any crime so committed."

133. Under section 31 of the Penal Code, Defendant is a principal of the violation of section 638.51 of the Penal Code by directly committed the act constituting the offense, which is a violation of section 638.51 of the Penal Code. Alternatively, Defendant is a principal of such offense because it "aid[ed] and "abet[ted] in its commission. Defendant aided in its commission by agreeing to allow the Third Parties' software to operate on its Website and, in fact, allowing such third-party software to

operate on such Website. Such acts were essential to the commission of the violation of section 638.51.

134. Defendant knew that the Third Parties would collect personal information when Defendant installed or allowed the installation of the relevant code on its Website. Defendant also knew that it would receive discounted or higher-quality analytics and other services derived from the data about consumers' online activities, including the option to target advertisements to customers that had merely browsed the Website.

135. The Third Parties' software operating via the Website is designed for the purpose of de-anonymizing and tracking visitors of the Website (and across other websites). The software design is not a mistake. *See Gladstone v. Amazon Web Servs., Inc.*, 2024 WL 3276490, at *11 (W.D. Wash. July 2, 2024) ("The SAC alleges that Amazon Connect is designed for the purpose of recording and analyzing communications between its customers (like Capital One) and consumers or other entities."). Defendant knew this before agreeing to install and allow such third party spyware software to exist and operate on its Website. "'[I]ntent,' in the law of torts, denotes not only those results the actor desires, but also those consequences which he [or she] knows are substantially certain to result from his [or her] conduct.'" *King v. U.S. Bank National Ass'n*, 53 Cal. App. 5th 675, 712 (2020), *rev. denied,* No. S264308 (Cal. Nov. 10, 2020) (quoting *Schroder v. Auto Driveway Co.*, 11 Cal. 3d 908, 922 (1974)).

136. Although Plaintiff informed Defendant that its conduct violated CIPA via a letter dated June 19, 2025, and subsequently via the filing of the original Complaint and First Amended Complaint filed in the instant action, Defendant failed to either delete or agree to delete Plaintiff's personal information from its records in response thereto including Plaintiff's IP address.

137. At minimum, Defendant's conduct may be considered intentional because it has been made aware of its wrongdoing via the commencement of this action many months ago, but has taken no remedial action to eliminate the wrongdoing. *Doe v. Meta*

- 46 -

*Platforms, Inc.*, 690 F. Supp. 3d 1064, 1076 (N.D. Cal. 2023) (citing *Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 684 (N.D. Cal. 2021) ("At the pleading stage, … interception may be considered intentional 'where a defendant is aware of the defect causing the interception but takes no remedial action.'") (quoting *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 815 (N.D. Cal. 2020))).

## V.    CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Federal Wiretap Act

### (Violation of 18 U.S.C. § 2511)

138.   Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

139.   The federal Wiretap Act creates criminal liability for "any person who … intentionally intercepts … any wire, oral, or electronic communication," or who "intentionally uses" such content "knowing or having reason to know that the information was obtained through" interception.  18 U.S.C. § 2511(1)(a) & (d).

140.   The third-party cookies or tracking pixels installed on the Website were used to intercept the contents of communications between Plaintiff and the Website in real time, including HTTP requests, URLs visited, and other metadata exchanged as part of Plaintiff's interactions with the Website. These communications constitute "electronic communications" under 18 U.S.C. § 2510(12).

141.   Defendant and/or its agents intentionally intercepted, or procured the interception of, these electronic communications using the cookies or tracking pixel technology, without Plaintiff's knowledge or consent.

142.   The interception occurred contemporaneously with the transmission of the electronic communication, satisfying the "in transit" requirement under the Wiretap Act.

143.   No exception under 18 U.S.C. § 2511(2)(d) applies because Plaintiff did not consent to the interception, and Defendant exceeded any purported authorization by

- 47 -

misrepresenting the nature of the data collection and the identity of the third-party recipients.

144. Defendant acted with a tortious and unlawful purpose when it enabled and permitted a third-party data broker to intercept Plaintiff's electronic communications through the use of a tracking pixel embedded on Defendant website. Under 18 U.S.C. § 2511(2)(d), even if one party to a communication consents, the Wiretap Act is violated if the interception is made for the purpose of committing any criminal or tortious act. Courts have recognized that surreptitious data collection in violation of privacy rights can satisfy this "tortious purpose" standard. In *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 607 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1684 (2021), the Ninth Circuit held that Facebook's interception of browsing activity via tracking technologies could constitute a violation of the Wiretap Act where the conduct was undertaken for the purpose of violating users' privacy rights, such as by committing the tort of intrusion upon seclusion. Here, Defendant's facilitation of a third-party's interception—despite promising to protect user privacy—was done with the purpose of enabling commercial exploitation of user data in violation of California common law privacy rights, including intrusion upon seclusion. This renders the interception unlawful under § 2511(2)(d).

145. Defendant intended to disclose its Website visitors' personally identifiable communications to Third Parties (and other third parties) so that it could deliver targeted advertisements to its customers despite its promise not to collect or use Private Communications for users who selected the "Required only" cookies button in the cookie consent banner.

146. Defendant customized and deployed the third party code embedded on its Website, which allowed the transmission and storage of third party cookies onto Plaintiff's device and browser, and, as a result, played an active role in the use of the code to intercept Plaintiff's electronic communications and knowingly and unlawfully used those intercepted communications to guide its advertising and marketing efforts.

SECOND AMENDED COMPLAINT

147. As a result of this unlawful interception, Plaintiff is entitled to damages under 18 U.S.C. § 2520(c)(2)(A)-(B), including the greater of actual damages and any profits made by the violator as a result of the violation or statutory damages of the greater of $100 per day per violation or $10,000, punitive damages under 18 U.S.C. § 2520(b)(2), reasonable attorney's fees under 18 U.S.C. § 2520(b)(3), and equitable relief and declaratory relief under 18 U.S.C. § 2520(b)(1).

## SECOND CLAIM FOR RELIEF

### Invasion of Privacy

148. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

149. To plead an invasion of privacy claim, Plaintiff must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiff had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

150. Defendant has intruded upon the following legally protected privacy interests of Plaintiff: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, Article I, § 1, which guarantees Californians the right to privacy; (iii) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (iv) Plaintiff's Fourth Amendment right to privacy.

151. Plaintiff had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could allow only "Required only" cookies and tracking technologies before proceeding to browse the Website. Plaintiff directed her electronic device to access the Website and, when presented with the pop-up cookies consent banner on the Website, Plaintiff rejected all non-essential cookies and reasonably expected that her rejection of all non-essential cookies and tracking technologies would be honored. That is, Plaintiff reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such

- 49 -

tracking technologies on her devices while Plaintiff browsed the Website. Plaintiff also reasonably expected that, if Plaintiff rejected all cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiff's Private Communications, including her browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

152. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website application, or advertisement." Cal. Civ. Code § 1798.140(u)(1)(F).

153. "A duty to disclose a material fact can arise if … it is imposed by statute…." *Zeichner v. Nord Security Inc.*, 2024 WL 4951261, at *6 (N.D. Cal. Dec. 2, 2024) (quoting *Rattagan v. Uber Techs., Inc.*, 17 Cal. 5th 1, 40 (2024)). Here, the CCPA and its regulations imposed upon Defendant a statutory duty to disclose material facts about its collection of personal information from California consumers who used the Website to avoid misleading such consumers about the nature of its personal information collection practices on the Website in May 2024.

154. Defendant violated the foregoing requirements by failing to provide a truthful and accurate Notice at Collection in accordance with the CCPA.[4] Such

---

[4] A "Notice at Collection" of personal information must comply with the CCPA, (Cal. Civ. Code § 1798.100(a)(1)-(3)), and California's regulation at 11 C.C.R. § 7012, which are part of the California Consumer Privacy Act Regulations, 11 C.C.R. § 7000(a). Such Regulations define "Notice at Collection" to mean "the notice given by a business to a consumer at or before the point at which a business collects personal information from the consumer as required by Civil Code section 1798.100, subdivisions (a) and (b), and specified in these regulations." 11 C.C.R. § 7001(q). Section 7012 provides, "The Notice at Collection shall be made readily available where consumers will encounter it at or before the point of collection of any personal information." 11 C.C.R. § 7012(c). Such regulation provides an "[i]llustrative example" as follows: "When a business collects consumers' personal information online, it may post a conspicuous link to the notice on the introductory page of the business's website and on all

Continued on the next page

- 50 -

SECOND AMENDED COMPLAINT

violations of the CCPA constitute material omissions by Defendant arising from a statutorily-prescribed duty.

155. Defendant, in violation of Plaintiff's reasonable expectation of privacy, and without Plaintiff's consent, permits the Third Parties and other third parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. The data that Defendant allowed third parties to collect enables the Third Parties to, inter alia, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as millennials, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties (and other third parties) share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiff's and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

156. Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive to a reasonable person (including Plaintiff).

Continued from the previous page
webpages where personal information is collected." 11 C.C.R. § 7012(c)(1). Section 7012 provides, "If a business does not give the Notice at Collection to the consumer at or before the point of collection of their personal information, the business shall not collect personal information from the consumer." 11 C.C.R. § 7012(d).

- 51 -

157. Defendant's intrusion into Plaintiff's privacy was also highly offensive to a reasonable person (including Plaintiff).

158. Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

159. Plaintiff has been damaged by Defendant's invasion of her privacy and is entitled to just compensation, including monetary damages.

160. Plaintiff seeks appropriate relief for that injury, including but not limited to, damages that will compensate her for the harm to her privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's privacy.

161. Plaintiff seeks punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and made in conscious disregard of Plaintiff's rights and Plaintiff's rejection of the Website's use of all cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

## THIRD CLAIM FOR RELIEF

### Intrusion Upon Seclusion

162. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

163. To assert a claim for intrusion upon seclusion, Plaintiff must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiff had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

- 52 -

164. By permitting third-party cookies to be stored on consumers' devices, which enabled the Third Parties (and other third parties) to track and collect Plaintiff's Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the Website's pop-up cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

165. The Third Parties' (and other third parties') tracking and collecting of Plaintiff's Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties (and other third parties)—was not authorized by Plaintiff, and, in fact, Plaintiff specifically chose to allow "Required only" cookies.

166. Plaintiff had an objectively reasonable expectation of privacy surrounding her Private Communications on the Website based on Defendant's promise that users could deny cookies other than "Required only" cookies, as well as state criminal and civil laws designed to protect individual privacy.

167. Defendant's intentional intrusion into Plaintiff's and other Website users' Private Communications would be highly offensive to a reasonable person (including Plaintiff) given that Defendant represented that Website users could allow only "Required only" cookies when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers rejected all such cookies. Indeed, Plaintiff reasonably expected, based on Defendant's false representations, that when she rejected all cookies and tracking technologies, Defendant would not cause such third-party cookies to be stored on her device or permit the Third Parties to obtain her Private Communications on the

- 53 -

Website, including her browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

168. Defendant's conduct was intentional and intruded on Plaintiff's Private Communications on the Website.

169. Plaintiff has been damaged by Defendant's invasion of her privacy and is entitled to just compensation, including monetary damages. *See Rodriguez v. Google LLC*, No. 3:20-cv-04688-RS, Doc. 670 (N.D. Cal. Sept. 4, 2025) (awarding $425,651,947 in actual damages in class action following jury verdict finding liability for invasion of privacy and intrusion upon seclusion claims).

170. Plaintiff seeks appropriate relief for that injury, including but not limited to, damages that will compensate her for the harm to her privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's privacy.

171. Plaintiff seeks punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and made in conscious disregard of Plaintiff's rights and Plaintiff's rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**FOURTH CLAIM FOR RELIEF**

**California Invasion of Privacy Act**

**(Violation of Cal. Penal Code § 631(a))**

172. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

173. California Penal Code § 631(a) provides, in pertinent part:

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the

- 54 -

communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

174.   The California Supreme Court has repeatedly stated an "express objective" of the California Invasion of Privacy Act ("CIPA"), codified at Cal. Penal Code § 630 *et seq.*, is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985).

175.   Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

"While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements."

*Ribas*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted).

176.   Section 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Court*, 22 Cal. 3d 187, 192-93 (1978).

SECOND AMENDED COMPLAINT

Thus, to establish liability under § 631(a), Plaintiff need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did *any* of the following:

"[i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;

[ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;

[iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained"

Cal. Penal Code § 631(a).

177.   Section 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

178.   Defendant is a "person" within the meaning of California Penal Code § 631.

179.   Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

180. The Third Parties' (and other third parties') cookies—as well as the software code of the Third Parties (and other third parties) responsible for placing the cookies and transmitting data from user devices to the Third Parties (and other third parties)—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

181. Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes.

182. Under § 631(a), Defendant must show it had the consent of all parties to a communication.

183. At all relevant times, the Website caused Plaintiff's browser to store the Third Parties' (and other third parties') cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties (and other third parties) without Plaintiff's consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise enabled the Third Parties (and other third parties) to wiretap Plaintiff using the Third Parties' (and other third parties') cookies and to accomplish the wrongful conduct alleged herein.

184. At all relevant times, by their cookies and corresponding software code, the Third Parties (and other third parties) willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff, on the one

- 57 -

hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

185. The Private Communications of Plaintiff, on the one hand, and Defendant, on the other, that the Third Parties (and other third parties) automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

186. At all relevant times, the Third Parties (and other third parties) used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

187. Plaintiff did not provide her prior consent to the Third Parties' (and other third parties') intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's electronic communications. Nor did Plaintiff provide her prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' (or other third parties') conduct. On the contrary, Plaintiff expressly declined to allow Third Parties' (or other third parties') cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiff's electronic communications by choosing to allow "Required only" cookies in the Website's cookie consent banner.

188. The wiretapping of Plaintiff occurred in California, where Plaintiff accessed the Website and where the Third Parties (and other third parties)—as enabled by Defendant—routed Plaintiff's electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties (and other third parties), resided on Plaintiff's California-located device. In

- 58 -

SECOND AMENDED COMPLAINT

particular, the user's California-based device, after downloading the software code from the Third Parties' (and other third parties') servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties (and other third parties).

189.    Plaintiff has suffered loss by reason of these violations, including, but not limited to, (i) violation of his and their right to privacy; (ii) loss of value in [his] and their Private Communications; (iii) damage to and loss of Plaintiff's property right to control the dissemination and use of their Private Communications; and (iv) loss of their Private Communications to the Third Parties (and other third parties) with no consent.

190.    Pursuant to California Penal Code § 637.2, Plaintiff has been injured by the violations of California Penal Code § 631, and seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

191.    Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiff's electronic Private Communications with Defendant. Plaintiff, and the general public continue to be at risk because Plaintiff, and the general public frequently use the internet to search for information and content related to amusement park services and products.  Plaintiff and the general public continue to desire to use the internet for that purpose.  Plaintiff and the general public have no practical way to know if her request to reject all non-essential cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiff's electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiff's electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

SECOND AMENDED COMPLAINT

## FIFTH CLAIM FOR RELIEF

### California Invasion of Privacy Act

### (Violation of Cal. Penal Code § 638.51)

192.   Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

193.   CIPA includes the following statement of purpose:

"The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."

(Cal. Penal Code § 630.)

194.   CIPA extends civil liability for various means of surveillance using technology, including the installation of a trap and trace device.  Sections 638.50 and 638.51 of the California Penal Code are part of the CIPA.

195.   California Penal Code § 638.51(a) provides that "a person may not install or use…a trap and trace device without first obtaining a court order…."

196.   A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."   Cal. Penal Code § 638.50(c).

197.   The Third Parties' (or other third parties') cookies and the corresponding software code installed by Defendant on its Website is each a "trap and trace device" because each "captures" "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiff's computer or device.  (Cal. Penal Code § 638.50(c).)

- 60 -

SECOND AMENDED COMPLAINT

198.   At all relevant times, Defendant caused the Third Parties' (and other third parties') cookies and the corresponding software code—which are trap and trace devices—to be placed on browsers and devices, and/or to be used to transmit Plaintiff's IP address and user-agent information. *See Greenley v. Kochava*, 684 F. Supp. 3d 1024, 1050-51 (S.D. Cal. 2023); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 928-33 (N.D. Cal. 2024).

199.   Some of the information collected by the Third Parties' (and other third parties') cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiff's electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

200.   Plaintiff did not provide her prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiff informed Defendant that she did not consent to the Website's use of third-party cookies by clicking the "Required only" cookies button in the cookie consent banner.

201.   Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiff's IP address and user-agent information.

202.   As a direct and proximate result of Defendant's conduct, Plaintiff suffered losses and was damaged in an amount to be determined at trial.

203.   Pursuant to Penal Code § 637.2(a)(1), Plaintiff is also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

## SIXTH CLAIM FOR RELIEF

### Common Law Fraud

204.   Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

- 61 -

205. Defendant fraudulently and deceptively informed Plaintiff that she could accept only "Required only" cookies.

206. However, despite Defendant's representations otherwise, Defendant caused third party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users clicked the "Required only" cookies button in the Website's pop-up cookie consent banner. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiff's Private Communications, even when consumers had previously chosen to accept only "Required only" cookies.

207. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiff, and material at the time they were made. Defendant knew, or should have known, how the Website functioned, including the Third Party's resources it installed on the Website and the third-party cookies in use on the Website, through testing the Website, evaluating their performance metrics by means of its accounts with the Third Parties, or otherwise, and knew, or should have known, that the Website's programming allowed the third-party cookies to be placed on users'—including Plaintiff's—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users attempted to allow only "Required only" cookies, which Defendant promised its users they could do.  Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to use the Website.  In misleading Plaintiff and not so informing her, Defendant breached its duty to Plaintiff.  Defendant also gained financially from, and as a result of, its breach.

208. Plaintiff relied to her detriment on Defendant's misrepresentations and fraudulent omissions.

209. Plaintiff has suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices,

including the unauthorized interception of her Private Communications, including her browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiff has also suffered harm in the form of diminution of the value of her private and personally identifiable information and communications.

210. Defendant's actions caused damage to and loss of Plaintiff's property right to control the dissemination and use of their personal information and communications.

211. Defendant's representation that consumers could reject all cookies if they clicked the "Required only" cookies button was untrue. Again, had Plaintiff known these facts, she would not have used the Website. Moreover, Plaintiff reviewed the Website's pop-up cookie consent banner prior to her interactions with the Website. Had Defendant disclosed that it caused third-party cookies to be stored on Website visitors' devices that share personal information with third parties, such as performance, targeting, and social media cookies, even after they choose to accept only "Required only" cookies, Plaintiff would have noticed it and would not have interacted with the Website.

212. By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiff to alter her position to her detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiff to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to reject all cookies. As a result, Plaintiff provided more personal data than she would have otherwise.

213. Plaintiff justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, was damaged by Defendant's conduct.

- 63 -

214.   As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiff has suffered damages, as alleged above, and is entitled to just compensation, including monetary damages.

215.   Plaintiff seeks punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff made in conscious disregard of Plaintiff's rights and Plaintiff's rejection of the Website's use of cookies.   Punitive damages are warranted to deter Defendant from engaging in future misconduct.

## SEVENTH CLAIM FOR RELIEF

### Unjust Enrichment

216.   Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

217.   Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

218.   Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could allow "Required only" cookies and by permitting the Third Parties to store and transmit cookies on Plaintiff's device and browser, which permitted the Third Parties to track and collect Plaintiff's Private Communications, including her browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Plaintiff rejected such cookies.

219.   Plaintiff's Private Communications have conferred an economic benefit on Defendant.

220.   Defendant has been unjustly enriched at the expense of Plaintiff, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

221.   Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiff conferred onto Defendant at her detriment. These benefits were

the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiff.

222.   It would be unjust for Defendant to retain the value of Plaintiff's property and any profits earned thereon.

223.   There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

224.   Plaintiff is entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiff to the position she occupied prior to having her Private Communications tracked and collected by the Third Parties.

225.   Plaintiff pleads this claim separately, as well as in the alternative, to her other claims, as without such claims Plaintiff would have no adequate legal remedy.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

a.  An award of compensatory damages, including statutory damages where available, to Plaintiff against Defendant for all damages sustained as a result of Defendant's wrongdoing including both pre- and post-judgment interest thereon;

b.  An award of punitive damages;

c.  An award of nominal damages;

d.  An order for full restitution;

e.  An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

f.  An order permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

g.  An order for declaratory relief;

h.  For reasonable attorneys' fees and costs as allowed by law; and

i.  For such further relief as may be just and proper.

SECOND AMENDED COMPLAINT

Dated:  April 15, 2026                    PACIFIC TRIAL ATTORNEYS, APC


By: */s/ Scott J. Ferrell*
Scott J. Ferrell
Attorneys for Plaintiff

- 66 -

SECOND AMENDED COMPLAINT